**GRANT & EISENHOFER P.A.**
Kimberly A. Evans (*Admitted Pro Hac Vice*)
123 Justison Street, 7th Floor
Wilmington, Delaware 19801
Tel: (302) 622-7086
Fax: (302) 622-7100
kevans@gelaw.com

**AL OTRO LADO, INC.**
Karlyn Kurichety (Cal Bar No. 313265)
634 S Spring St, Suite 908
Los Angeles, CA 90014
Tel: (253) 882-8071
karlyn@alotrolado.org

[additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| TAMMY JANE OWEN as the Administrator of the Estate of Benjamin James Owen; AL OTRO LADO, INC.; and MIRAN MIRIMANIAN,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and U.S. DEPARTMENT OF HOMELAND SECURITY – OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES,<br><br>Defendants. | Case 2:22-cv-00550-DSF-AFM<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

**PRELIMINARY STATEMENT**

1.      Benjamin James Owen ("Ben") was a 39-year-old British national who died in Defendant U.S. Immigration and Customs Enforcement ("ICE") custody on January 25, 2020. At the time of his wrongful detention Ben was lawfully residing in the United States with his U.S. citizen wife and their three-month-old daughter subject to a Period of Stay Authorized by the U.S. Attorney General ("APOSABAG").  ICE improperly issued an immigration detainer request for Ben that lacked legal basis.  The illegal detainer request was honored by the Volusia County Department of Corrections.  Ben was then transferred into ICE custody and taken to the Baker County Detention Center ("BCDC") in Macclenny, Florida, where he was unlawfully detained.  ICE's unlawful detainer and Ben's subsequent improper detention at BCDC, a facility with a well-known track record of significant safety issues and extremely poor conditions, resulted in Ben's untimely and tragic death by alleged suicide a mere nine days after his unlawful incarceration at BCDC began.

2.      Maria Celeste Ochoa-Yoc De Ramirez ("Maria") was a 22-year-old Guatemalan refugee who died in ICE custody on March 8, 2020.  At the time of her detention, Maria was seeking humanitarian protection, and ICE had noted that Maria had already taken the first step in seeking asylum by conducting her "credible fear" interview with the U.S. Government.  While in detention, Maria was hospitalized three times before her untimely death: once for surgery, once for abdominal pain, and once more before her death.  Her cause of death was autoimmune hepatitis, complicated by septic shock and acute liver failure.

3.      Gourgen Mirimanian ("Gourgen") was a 54-year-old Armenian national and Lawful Permanent Resident ("LPR") of the United States who died in ICE custody on April 10, 2018.  Immediately prior to his detention by ICE, the federal Bureau of Prisons ("BOP") transferred Gourgen from a prison in California to a Federal Medical Center ("FMC"), Carswell, in Fort Worth, Texas, so that correctional medical officials could monitor his severe and chronic heart conditions and hypertension.  At the time ICE assumed custody of Gourgen on February 6, 2018, and transferred him to the privately-owned, for-profit Prairieland Detention Center ("PDC") in Alvarado, Texas, ICE knew the facility had a 40% staffing shortage of registered

nurses, which ICE's contractor was filling with Licensed Vocational Nurses, who were also 25% short-staffed.  When Gourgen presented with cardiac symptoms and was recommended for outside cardiac treatment, ICE and its contractor failed for two months to schedule his transportation to get the medical care he needed.  As documented by ICE death reviews, PDC and ICE medical personnel utilized an unreliable and ineffective method of distributing medications that prevented effective tracking of Gourgen's medication, and even prescribed medications that were contraindicated for persons with chronic heart conditions, like Gourgen. Gourgen died of an alleged heart attack on April 10, 2018.  The federal government approved an Immigrant Visa Petition for Gourgen by his U.S. Citizen relative months after he died.

4.     Ben, Maria, and Gourgen's deaths are not outliers.  They are three of the hundreds of deaths of people in ICE custody since 2003, which have alarmingly and horrifically increased over the past decade.  ICE in-custody deaths have provoked significant and widespread public outcry for change, reform, and even abolition of ICE's deadly detention system.[1]  These deaths are thus part of a larger systemic breakdown of the federal government's detention program. This context provides the reason why Ben's, Maria's, and Gourgen's cases have become a significant part of a broader effort to prevent additional deaths under ICE's watch, including widespread efforts by Plaintiff Al Otro Lado, Inc. ("AOL") to inform the public about these issues and advocate for changes in the federal detention system.

5.     This action is brought pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (the "FOIA" or the "Act') , and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to obtain records improperly withheld by Defendants concerning Ben's, Maria's, and Gourgen's untimely deaths and generally concerning the in-custody deaths of other persons detained by ICE.  Pursuant to various FOIA requests, as articulated herein, Plaintiffs seek records from Defendants ICE and the U.S. Department of Homeland Security ("DHS") Office for Civil Rights

---

[1] The Trump Administration's Mistreatment of Detained Immigrants: Deaths and Deficient Medicare By For-Profit Detention Contractors, Staff Report Committee on Oversight and Reform and Subcommittee on Civil Rights and Civil Liberties, U.S. House of Representatives, Sept. 2020, https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-09-24.%20Staff%20Report%20on%20ICE%20Contractors.pdf (last accessed April 29, 2022).

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

and Civil Liberties ("DHS CRCL," and collectively with ICE, the "Defendants" and each a "Defendant"). Defendants have both failed to acknowledge Plaintiffs' various FOIA requests, as required by law, and have otherwise failed to adequately respond to Plaintiffs' FOIA requests, all in violation of the Act.

## JURISDICTION AND VENUE

6.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B). Plaintiffs' request for declaratory and other relief is properly subject to this Court's subject-matter jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(F) and 28 U.S.C. §§ 1331, 2201(a), and 2202.

7.     Venue is proper within this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1391(b)(1), (b)(2), and (e)(1).

8.     Plaintiffs have constructively exhausted all administrative remedies in connection with their FOIA requests, as detailed below.

## PARTIES

9.     Plaintiff Tammy Jane Owen ("Tammy") is an adult resident of Daytona Beach, Florida. She is the widow of Ben, and brings this action in her capacity as the court-appointed personal representative of Ben's estate pursuant to an Order entered on August 13, 2021 in the matter captioned *In Re: Estate of Ben James Owen,* Deceased, File No. 2021-11802-PRDL, Circuit Court of the Seventh Judicial District, Volusia County. *See* **Exhibit A**.

10.    Plaintiff AOL is a non-profit, non-partisan, binational organization based primarily in Los Angeles, California and in Tijuana, Baja California, Mexico. AOL is a legal services organization serving indigent deportees, migrants, refugees, and their families. AOL's mission is to coordinate and to provide screening, advocacy, and legal representation for individuals in immigration proceedings and detained by DHS, to seek redress for civil rights violations, and to provide assistance with other legal and social service needs. AOL regularly provides information and analysis to the media and the general public, as well as to international human rights advocacy organizations and human rights monitoring bodies. AOL actively shares and publicly disseminates information about its work and conditions on the U.S.-Mexico border

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

and in immigration detention through its various social media accounts and website. Disseminating information to the public is a critical component of AOL's work, which AOL does at no cost to the public.

11.     Plaintiff Miran Mirimanian ("Miran") (collectively with Tammy and AOL, the "Plaintiffs" and each a "Plaintiff"), is the son and next-of-kin of Gourgen.  Miran is a resident of Los Angeles, California.

12.     Defendant ICE is an agency within the meaning of 5 U.S.C. § 552(1)(f).  ICE has possession, custody, and control of records responsive to Plaintiffs' FOIA requests.

13.     Defendant DHS CRCL is an agency within the meaning of 5 U.S.C. § 552(1)(f). CRCL has possession, custody, and control of records responsive to one of Plaintiffs' FOIA requests.

## FACTS

### A.     BEN'S UNLAWFUL SEIZURE AND DETENTION

14.     On July 23, 2019, and continuing until his untimely death on January 25, 2020, Ben lawfully entered and thereafter lawfully resided in the United States on an O2 Visa (the "O2 Visa").  The O2 Visa expired on December 10, 2019.

15.     Prior to the expiration date of the O2 Visa, on December 9, 2019, Ben lawfully and timely submitted an Adjustment of Status (AOS) application on the basis of his marriage to Plaintiff Tammy, a U.S. citizen.

16.     Due to his AOS application, Ben was subject to an APOSABAG which allowed Ben to lawfully reside in the United States while his application to adjust his status and become a United States citizen was pending (including allowing Ben to lawfully reside in the United States past December 10, 2019, the expiration date of his O2 Visa).

17.     On January 13, 2020, a judge in the Volusia County Circuit Court, Florida, ordered Ben's release on his own recognizance in relation to criminal charge(s) pending against Ben that served as the only legal basis for his pre-trial detention in Volusia County Jail in Daytona Beach, Florida.

18.     However, in violation of the Fourth Amendment's requirement that any custodial deprivation of liberty be supported by a warrant and probable cause, Volusia County and the Volusia County Department of Corrections failed to free Ben upon the Court's January 13, 2020 order that Ben be released on his own recognizance.  *See generally Roy v. Cnty. of Los Angeles et al.*, CV1209012ABFFMX, 2018 WL 914773 (C.D. Cal. Feb. 7, 2018); *see also Roy v. County of Los Angeles*, ACLU Southern California, *available at* https://www.aclusocal.org/en/cases/roy-v-county-los-angeles (last accessed April 29, 2022).

19.     While Defendants have unlawfully withheld a copy of the Form I-247 Immigration Detainer requested by Plaintiff Tammy as part of the Owen FOIA Request, Plaintiff Tammy, on behalf of Ben's estate, alleges, upon information and belief, that the sole basis for Ben's continued imprisonment following the January 13, 2020 Court order that Ben be released on his own recognizance was ICE's warrantless immigration detainer request.

20.     On or about January 13, 2020 or January 14, 2020, while Ben was still being held in the custody of Volusia County, U.S. Enforcement and Removal Operations ("ERO") agents arrested Ben without probable cause and served him with a Notice to Appear (Form I-862) that charged him with removability under Section 237(a)(1)(B) of the Immigration and Nationality Act, 8 USC § 1101, *et seq.* (the "INA").

21.     Contrary to ICE's public statements,[2] at the time of this unlawful arrest, Ben resided in the United States lawfully pursuant to the APOSABAG triggered by Ben's lawful and timely AOS application that had been submitted on the basis of his marriage to Plaintiff Tammy, a U.S. citizen.

22.     On information and belief, no ICE Enforcement and Removal Operations ("ERO") official took any action to formally revoke Ben's APOSABAG prior to issuing the

---

[2] *See* U.S. Immigration and Customs Enforcement (ICE) Detainee Death Report: OWEN, Ben James, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations (Feb. 27, 2020), https://www.aila.org/File/Related/18121905r.pdf (last accessed April 29, 2022); United Kingdom man in ICE custody passes away in Florida, Detainee Death Notifications, U.S. Immigration and Customs Enforcement (Jan. 27, 2020), https://www.ice.gov/news/releases/united-kingdom-man-ice-custody-passes-away-florida (last accessed April 29, 2022).

detainer request or even after his seizure and detention by ICE, in violation of the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment.

23.    Indeed, ICE affirmatively misled Congress by transmitting a congressionally-mandated detainee death report regarding Ben's death that omitted the material fact that he had timely applied for an adjustment of status and triggered his APOSABAG.

24.    ICE's issuance of an immigration detainer request and seizure of Ben was unlawful because ERO transmitted it without first securing a probable cause determination by a neutral magistrate that the Fourth Amendment requires.

25.    This fact resulted in Ben's subsequent unlawful detention by ICE at BCDC in violation of Ben's rights under the Fourth and Fifth Amendments.

26.    ICE subsequently failed to provide Ben with his constitutionally-protected rights to a prompt probable cause determination within forty-eight hours of his federal arrest. *See generally Riverside v. McLaughlin*, 500 U.S. 44 (1991).

27.    While ICE often justifies its serial deprivation of this right to non-citizens on the basis that their detention is "civil" in nature, ICE transferred Ben to BCDC, a facility which was designed by and for ***criminal*** incarceration. *See King v. Cnty. of Los Angeles*, 885 F.3d 548 (9th Cir. 2018) (holding that civilly confined people must be held in conditions less restrictive than those held in criminal detention).

28.    On January 25, 2020, twelve days from the date of his initial detention by Volusia County and a mere nine days from the date that his unlawful incarceration at BCDC began, Ben died by alleged suicide while in custody.

29.    On or around January 28, 2020, Plaintiff Tammy was notified of Ben's death—this notification came ***three entire days*** after Ben's passing.  ICE and BCDC's failure to notify Tammy, as Ben's spouse, of his death is in violation of ICE detainee notification procedures.

30.    Moreover, upon any in-custody death alleged to have occurred by suicide, ICE is further required to conduct a psychological forensic autopsy of the decedent, which includes conducting interviews of individuals that are likely to possess knowledge relevant to the decedent's death, including close friends and family members.  Upon information and belief,

ICE never conducted this required psychological forensic autopsy for Ben, nor has Tammy, as Ben's widow, ever been contacted about same.

**B.   MARIA'S DETENTION AND IN-CUSTODY DEATH**

31.   Maria was a Guatemalan refugee seeking humanitarian protection and asylum in the United States.

32.   On September 4, 2019, U.S. Customs and Border Patrol ("CBP") arrested Maria as she entered the United States near Hidalgo, Texas, seeking asylum.

33.   On September 6, 2019, CBP transferred Maria to the El Valle Detention Facility ("EVDC") in Raymondville, Texas, where she entered into ICE custody.

34.   During her intake at EVDC, Maria's vital signs were normal.  Maria denied a history of any medical health conditions but did report an allergy to gentamicin and was cleared for general population.

35.   Maria remained in ICE custody until her untimely death on March 9, 2020, at the age of 22-years-old.

36.   From September 6, 2019 to March 8, 2020, Maria was housed at three ICE detention facilities: (1) EVDC from September 6-12, 2019; (2) Kay County Detention Center ("KCDC") in Newkirk, Oklahoma, from September 12, 2019 through February 13, 2020; and (3) PDC in Alvarado, Texas, from February 13-18, 2020.

37.   On September 12, 2019, during her intake to KCDC, Maria denied having any history of medical issues, except for reporting that she had a history of post-traumatic stress disorder (PTSD) from sexual assault.  Maria's vital signs were normal and she was cleared for general population.

38.   Despite having a positive credible fear determination as part of her application seeking asylum from the U.S. Government, on October 8, 2019, Maria was issued a Notice to Appear by U.S. Citizenship and Immigration Services ("USCIS"), and remained in ICE custody while improper removal proceedings were initiated within the U.S. Department of Justice.

39.     On February 7, 2020, Maria was diagnosed with cholecystitis (inflammation of the gall bladder), acute biliary pancreatitis (inflammation of the pancreas), and transferred to Mercy Hospital in Oklahoma City, Oklahoma, for further testing.

40.     On February 8, 2020, Maria had a cholecystectomy (surgical removal of gall bladder).

41.     On February 10, 2020, Maria was discharged by Mercy Hospital and returned to KCDC.

42.     On February 12, 2020, Maria was transferred to PDC for a mental health evaluation, including an evaluation of possible PTSD and bulimia.

43.     On February 14, 2020, while at PDC Maria was diagnosed with PTSD stemming from a history of spousal sexual and physical abuse and referred for a psychiatric evaluation. Maria also complained of poor appetite, dry mouth, weakness, and difficulty sleeping.

44.     On February 17, 2020, Maria's comprehensive metabolic panel (CMP) laboratory test results were abnormal.

45.     On February 18, 2020, Maria was transported to Texas Health Huguley Hospital ("THHH") in Burleson, Texas, for additional medical treatment and to rule out bile duct obstruction.  Maria was admitted for elevated liver enzymes, abdominal pain with nausea and vomiting, and acute pancreatitis.  Maria remained in inpatient care at THHH until February 29, 2020, when she was transferred to Texas Health Harris Methodist Hospital ("THHMH") for a hepatology.

46.     On March 6, 2020, as her condition worsened with persistent and worsening acidosis and hypertension, Maria required intubation and was placed on a ventilator to assist her with breathing.

47.     On March 7, 2020, Maria's condition continued to deteriorate and showed impaired temperature regulation, multi-organ system failure, and no evidence of brain activity.

48.     On March 8, 2020, Maria experienced cardiac arrest three times with unsuccessful resuscitation.  At 8:35 a.m., medical professionals at THHMH pronounced Maria

FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

dead.  The cause of death was stated as autoimmune hepatitis, complicated by septic shock and acute liver failure.

### C.   GOURGEN'S DETENTION AND IN-CUSTODY DEATH

49.    Gourgen's serious cardiac condition and the heightened level of care it required of the correctional medical system to keep him alive was so obvious to the BOP that the agency transferred him from a prison in California to FMC in Fort Worth, Texas, until he completed his criminal sentence.

50.    ICE's Immigrant Health Services Corps (IHSC) had nearly two months after the agency lodged a detainer request against Gourgen with the BOP on December 12, 2017, to consider an appropriate placement for Gourgen where he could get the medical care he needed.

51.    Yet FOIA records obtained from the BOP appear to show that no IHSC official or other ICE personnel ever contacted Gourgen's care providers at FMC to discuss his medical needs and an appropriate custodial placement prior to arrest and detention by ICE.

52.    Unlike the BOP, ICE elected to transfer Gourgen to a general population facility that suffered from well-documented, serious medical understaffing.

53.    DHS CRCL had made "previous formal recommendations" to ICE aimed at ensuring continuity of care for people requiring specialist appointments.

54.    Specifically, in January 2018, prior to Gourgen's arrest by ICE and transfer to PDC, DHS CRCL investigated a medical complaint from a person locked inside PDC.

55.    CRCL's conclusion, memorialized on page 50 of the agency's 2018 Annual Report to Congress, provides a chillingly accurate summation of the dangers of transferring people into PDC for detention by ICE – dangers realized by Maria's and Gourgen's deaths:

> **Continuity of Medical Care**:  In January 2018, CRCL received a complaint regarding an ICE detainee housed at both Prairieland Detention Center in Alvarado, Texas and Okmulgee County Jail in Okmulgee, Oklahoma, who allegedly received inadequate care for issues with his feet.  Based on information received, **ICE IHSC implemented a corrective action plan to address issues at both facilities including quality of care concerns related to delayed specialty care appointments**, and a lack of documented refusals for care.  After reviewing the plan, **CRCL's medical expert noted that the detainee's medical care was interrupted with each transfer,** and a

9

workup of his condition was started anew at each facility. **CRCL reiterated** <u>**previous**</u> <u>**formal**</u> <u>**recommendations**</u> **made to ICE regarding the importance of continuity of medical care when detainees are transferred** which noted that facility transfers, while at times necessary**, can hamper efforts to meet these standards** and should therefore be accompanied by appropriate procedural safeguards.[3]

56.     When Gourgen arrived at PDC on February 7, 2018, officials identified him as a person with serious medical conditions that would require chronic care, treatment, and monitoring to ensure his safety.

57.     While medical professionals recommended Gourgen be transported to see a specialist regarding his cardiac condition, ICE and its contractor that ran PDC failed to arrange such transport for nearly two months.

58.     During this time, Gourgen and his family complained to PDC facility officials of a "burning, squeezing pain" in his chest.

59.     At the same time, ICE allowed contract medical and facility staff to implement a "Keep On Person" medical administration plan that prevented professionals from closely monitoring Gourgen's condition.

60.     On information and belief, providers prescribed Gourgen medications like ibuprofen and other NSAIDs that were contraindicated for individuals with severe heart conditions like Gourgen.

61.     On March 7, 2018, Gourgen requested treatment for chest pain that lasted 30-40 seconds.  Gourgen's subsequent EKG results were abnormal.  While Gourgen was referred to cardiology, an appointment was only scheduled for April 13, 2018.

62.     On April 10, 2018, Gourgen was found unresponsive, not breathing, and without a pulse by staff at PDC.

---

[3] Fiscal Year 2018 Annual Report to Congress, U.S. Dep't of Homeland Security, Office for Civil Rights and Civil Liberties (Nov. 18, 2019), *https://www.dhs.gov/sites/default/files/publications/crcl-fy-2018-annual-report_0.pdf* (emphasis added).

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

63.     On April 13, 2018, the State of Texas Department of State Health Services issued a Certificate of Death documenting Gourgen's cause of death as hypertensive and atherosclerotic cardiovascular disease.

64.     Following his death, ICE required Gourgen's family to pay to transport their loved one from Texas to California.

65.     No ICE official or contractor has ever been investigated for making the decision to take a chronically ill man out of a correctional medical center and place him directly into an understaffed general population detention facility.

**D.     SIGNIFICANT PUBLIC INTEREST AND OUTCRY IN BEN'S, MARIA'S, AND GOURGEN'S UNTIMELY DEATHS**

66.     The in-custody deaths of Ben, Maria, and Gourgen drew significant public outcry and media attention.[4]  Ben's in-custody death also prompted an investigation by the British Consul General.   Gourgen's in-custody death, and ICE's failure to timely deliver the Congressionally mandated death report following it, similarly raised significant public interest.[5]

---

[4] *See e.g.*, Hamed Aleaziz, A British Man Has Become The Fifth Immigrant to Die in ICE Custody Since October, BUZZFEED NEWS, Jan. 27, 2020, https://www.buzzfeednews.com/article/hamedaleaziz/british-immigrant-dies-ice-custody (last accessed April 29, 2022); Camilo Montoya-Galvez, Death of British Immigrant Marks Third Apparent Suicide in ICE Custody in 4 Months, CBS NEWS, Jan. 27. 2020, https://www.cbsnews.com/news/death-of-british-immigrant-marks-third-apparent-suicide-in-ice-custody-in-4-months/ (last accessed April 29, 2022); Bev Holder, Wife's Heartbreak After Ben Owen Dies in US Detention Centre, DUDLEY NEWS, Jan. 6, 2020, https://www.dudleynews.co.uk/news/18213064.wifes-heartbreak-ben-owen-dies-us-detention-centre/ (last accessed April 29, 2022); Daniella Silva, Guatemalan Woman Dies in ICE Custody in Texas, Eighth Death Since October, NBC NEWS, March 10, 2020, (https://www.nbcnews.com/news/us-news/guatemalan-woman-dies-ice-custody-texas-eighth-death-october-n1154136) (last accessed April 29, 2022); Dianne Solis and Imelda Garcia, Guatemalan Asylum-Seeker Dies in ICE Custody in Fort Worth Hospital, March 10, 2020, https://www.dallasnews.com/news/2020/03/10/guatemalan-asylum-seeker-dies-in-ice-custody-in-fort-worth-hospital/ (last accessed April 29, 2022).

[5] *See, e.g.* Robin Urevich, ICE's Missing Death Reports, Capital & Main (Dec. 21, 2018),https://capitalandmain.com/ices-missing-death-reports-1221 (last accessed April 29, 2022); "ICE Releases Sham Immigrant Death Reports As It Dodges Accountability and Flouts Congressional Requirements," National Immigrant Justice Center (Dec. 19, 2018), https://immigrantjustice.org/press-releases/ice-releases-sham-immigrant-death-reports-it-dodges-accountability-and-flouts (last accessed April 29, 2022). Undersigned counsel secured a separate judgment from the Northern District of California that ICE violated the Freedom of Information Act by failing to make FOIA records promptly available to the Estate of Roxsana Hernandez, whose questions about the missing ICE death reports led to ICE's release of

67.     With respect to Maria and Gourgen's deaths at PDC, DHS CRCL issued a retention memo to ICE officials on August 7, 2020, indicating it would investigate the agency's findings that ICE and its contractor had violated federal detention and medical care standards relating to both deaths.[6]

68.     Not only have these in-custody deaths garnered significant public interest, but they unfortunately are also more horrific examples of a widespread issue of repeated in-custody deaths of persons detained by ICE.  *See, e.g.,* Cathrin E. Shoichet, The death toll in ICE custody is the highest it's been in 15 years, CNN, Sept. 30, 2020, https://www.cnn.com/2020/09/30/us/ice-deaths-detention-2020/index.html (last accessed April 29, 2022); Grace Vitaglione & Sammy Sussman, Families, activists, ACLU question ICE's accounting of deaths in detention, IRW: INVESTIGATIVE REPORTING WORKSHOP, Nov. 15, 2021, https://investigativereportingworkshop.org/investigation/dying-in-silence/ (last accessed April 29, 2022).

69.     Ben's, Maria's, and Gourgen's deaths are thus not outliers.  Over the past decade, there have been an increasing number of ICE in-custody deaths at detention facilities like BCDC—criminal jail facilities that ICE contracts with to "civilly" detain persons pending removal proceedings.  At the time of his death, Ben was the third person to end his life in ICE custody for the 2020 fiscal year, and the fifth person to die in ICE custody in four months.[7]  This pattern is alarming and has provoked widespread public outcry for change, reform, and even abolition of ICE's deadly detention system.[8]

---

Gourgen's death report in late 2018.  *See Transgender L. Ctr. v. United States Immigr. & Customs Enf't.*, 19-CV-03032-SK, 2020 WL 7382113 (N.D. Cal. Nov. 24, 2020).

[6] Memorandum from Peter E. Mina, Deputy Officer for Programs and Compliance, DHS Office for Civil Rights and Civil Liberties to Matthew T. Albence, Acting Director, U.S. Immigration and Customs Enforcement re: Prairieland Detention Center (Aug. 7, 2020), https://www.dhs.gov/sites/default/files/publications/prairieland-detention-center-08-07-20.pdf, (last accessed April. 29, 2022).

[7] *See* U.S. Immigration and Customs Enforcement, Detainee Death Reporting, Jan. 7, 2022, https://www.ice.gov/detain/detainee-death-reporting (last accessed April 29, 2022).

[8] *See generally* P. Parmar, et. al, Mapping factors associated with deaths in immigration detention in the United States, 2011-2018: A thematic analysis, 2021(2) 100040, The Lancet Regional Health – Americas,  https://doi.org/10.1016/j.lana.2021.100040 (last accessed April 29, 2022).

70.     Given ICE's widely reported atrocities and the alarming number of deaths of persons in ICE custody, it is unsurprising that these deaths have become another horrifying example of a larger systemic breakdown of the federal government's detention program.  This context is also the reason why in-custody deaths are a significant part of a broader effort to prevent additional deaths under ICE's watch.

71.     The records sought by Plaintiffs' FOIA requests, as delineated herein, are thus critical to informing the public about the process by which the U.S. government issues immigration detainers and thereafter ensures the safety and welfare of persons in its custody.  These records also inform Plaintiffs' and the general public's significant interest in their government's decisions concerning the allocation and use of U.S. tax revenues for the detention of non-citizens.

**E.     DEFENDANT ICE'S UNLAWFUL FAILURE TO ACKNOWLEDGE OR RESPOND TO PLAINTIFF TAMMY'S FOIA REQUEST REGARDING BEN JAMES OWEN**

72.     On July 22, 2021, Plaintiff Tammy submitted a FOIA request to ICE by way of its listed email, ICE-FOIA@dhs.com (the "Owen FOIA Request").  *See* **Exhibit B**.

73.     The Owen FOIA Request sought the release of the following records:

a.     Any and all documents, logs, case notes, database entries, and forms that make any reference to Owen, were signed by him, or are in his case file.

b.     Any and all records of investigations, inspections, audits, and reports pertaining to Owen within the possession of ICE beginning from July 23, 2019 when he was taken into ICE custody through the present.

c.     Any and all investigations, inspections, reports, audits, notes, and communications pertaining to the death and surrounding circumstances of Owen within the possession of ICE from July 23, 2019 through the present, including but not limited to:

i.     Any and all medical and mental health records, reports, notes, forms, complaints, incident reports, supplementary reports, witness statements, daily activity logs, incident detail reports, media requests and responses to media request, and video and audio recordings.

d.     Any and all records pertaining to Owen's detention, including but not limited to:

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

      i.      Any and all detainee location logs, kites, grievances, responses to kites and grievances, and medical and mental health screenings and assessments.

e.      Any and all records pertaining to any investigations of the circumstances surrounding Owen's arrest, detention, and death that are being conducted by ICE, ICE Office of Professional Responsibility, ICE Office of Detention Oversight, or any other DHS entity or any other government entity, including but not limited to, a detainee death review and root cause analysis, and including all drafts of same.

f.      Any and all communications, memorandums, and media pertaining to Ben Owen within the possession of ICE from July 23, 2019 to present, including but not limited to:

      i.      Any and all email exchanges, text messages, slack, snapchat, voicemail, and all other electronic communications.

      ii.      Any and all media requests, responses to media requests, notes, reports, and database entries.

      iii.      Any and all video and audio.

g.      Any and all requests for records within possession of ICE that pertain to Owen generated from July 23, 2019 to the present, including but not limited to:

      i.      Any and all requests received by ICE pursuant to 5 U.S.C. §552 *et. seq.* or any other legal authority authorizing the release of records to the public.

h.      Any and all documents or copies thereof that may have accompanied Owen when he was transferred from Volusia County Branch Jail to BCDC, including but not limited to:

      i.      Any Form I-216 and/or appropriate copies of Form I-77, Baggage Check (or IGSA equivalent);

      ii.      Any Form USM-553 or local Medical Transfer Summary form;

      iii.      Any Form 1-213, Record of Deportable/Inadmissible Alien Form;

      iv.      Any original or photocopy of Form I-203/203A, Order to Detain/Release Alien;

      v.      Any Detainee Transfer Checklist;

      vi.      Any age verification documents (if applicable);

      vii.      Any copy or printout of all previous Post Order Custody Reviews (POCRs) and travel document requests in a property envelope fastened to the file;

14

viii.     Any classification sheet;

ix.     Any charging documents/records of proceedings;

x.     Any certified copies of convictions;

xi.     Any fingerprint cards;

xii.     Any photographs; and

xiii.     Any printouts from the Central Index System (CIS), ENFORCE and the FBI NCIC database.

i.     A complete copy of the government's file for A# "219403429" or A# "219 403 429" or A# "219-403-429."

j.     Any other reports or memoranda pertaining to the death or detention of Owen.

k.     Any and all records within the possession of ICE pertaining to the operation of BCDC, including but not limited to:

i.     Any and all records relating to ICE's standards of operation at BCDC, including but not limited to its standard for medical care, suicide prevention, and sanitation and cleanliness requirements; and

ii.     Any and all records of complaints or correspondences to or from ICE personnel regarding conditions at BCDC and any reports or recommendations made regarding the quality or conditions at BCDC.

74.     To date, Plaintiff Tammy has not received either an acknowledgment by ICE of receipt of the Owen Request or a response from ICE to the Owen FOIA Request.

75.     On both September 14, 2021 and September 16, 2021, Plaintiff Tammy sent correspondence to ICE inquiring as to the status of the Owen FOIA Request and requesting a date certain by which a response to the Owen FOIA Request would be received.  To date, Plaintiff Tammy has not received any response from ICE to either correspondence.

76.     On October 13, 2021, Plaintiff Tammy resubmitted the Owen FOIA Request to ICE by uploading it to ICE's online FOIA portal.  *See* **Exhibit C**.  Once again, to date, Plaintiff Tammy has not received either an acknowledgment or response from ICE to the re-submitted Owen FOIA Request.

77.     On November 18, 2021, Plaintiff Tammy sent an e-mail to FOIA Officer Fernando Pineiro inquiring about the status of the Owen FOIA Request.  *See* **Exhibit D**.  To date, Plaintiff Tammy has not received any response to this email.

78.     As of the date of this amended filing – ___*281 days after submission of the initial*___ ___*request*___ – ICE has not responded to the Owen FOIA Request or produced any records in response to this request in violation of the FOIA.

79.     With respect to the Owen FOIA Request, and despite the significant public interest in Ben's death as articulated herein, ICE has failed to: (1) confirm receipt of the Owen FOIA Request and provide the necessary tracking number; (2) notify Plaintiff Tammy of any determination regarding the Owen FOIA Request, including the full scope of any responsive records the agency intends to produce or withhold and the reasons for any withholdings, thereby violating the timing requirements of the FOIA; and (3) produce all relevant requested records or alternatively demonstrate that the requested records are lawfully exempt from production as required by the FOIA.

80.     Plaintiff Tammy has constructively exhausted her administrative remedies because ICE has failed to make a determination in response to the Owen FOIA Request within the time period required by law.  Given this fact, Plaintiff Tammy seeks immediate judicial review.

F.     **DEFENDANTS ICE AND DHS CRCL UNLAWFUL FAILURE TO ACKNOWLEDGE OR RESPOND TO PLAINTIFF AOL'S FOIA REQUESTS**

1.     **The Yoc de Ramirez FOIA Request submitted by Plaintiff AOL.**

81.     On January 4, 2021, Plaintiff AOL sent ICE a FOIA request regarding the death of Maria Celeste Ochoa-Yoc De Ramirez (the "Yoc de Ramirez FOIA Request").  *See* **Exhibit E**.

82.     The Yoc de Ramirez FOIA Request requested all records related to the March 8, 2020 death of Maria Celeste Ochoa-Yoc De Ramirez in ICE custody, including:

> a.     The "Detainee Death Review" and "Healthcare and Security Compliance Analysis" reports and any records relied upon to complete those reports—or equivalent internal procedural analysis—completed by or for ICE Office of Professional Responsibility related to the death of Ms. Ochoa-Yoc De Ramirez;

16

b.     A complete copy of any independent autopsies supplied to DHS or ICE, including those by county or state medical examiners, for Ms. Ochoa-Yoc De Ramirez;

c.     All "Mortality Reviews," "Event Review," "Root Cause Analysis," or "Action Plan," created by the Immigrant Health Services Corps ("IHSC") regarding the death of Ms. Ochoa-Yoc De Ramirez;

d.     Any communications regarding this event between IHSC and any contractor or ERO staff at Kay County Detention Center ("KCDC");

e.     Any Root Cause Analysis created by the IHSC for any Sentinel Event occurring at KCDC between January 1, 2019 to present;

f.     Any electronic communications including but not limited to e-mails, text messages, and instant messages on any platform, to and from any Field Office Director, Deputy Field Office Director, or Assistant Field Office Director of ICE's Chicago and Dallas Field Offices containing the words "Yoc de Ramirez" or "Maria Ochoa." The time range for this search should be from September 13, 2019 to the date the officer engages in this search;

g.     Communications occurring on or after January 1, 2019, to or from ICE's Detention Standards Compliance Unit regarding KCDC's compliance or non-compliance with ICE's Performance-Based National Detention Standards;

h.     All Significant Incident Reports ("SIR") and any associated records relating to KCDC or immigrants detained therein between January 1, 2019 and the present;

i.     All documents pertaining to Detainee Reporting and Information Line Calls made from KCDC between January 1, 2019 and the present.

83.    As of the date of this amended filing – ***483 days after submission of the initial request*** – Plaintiff AOL has not received any acknowledgement from ICE of the FOIA request, tracking number, substantive response, or otherwise produced records responsive to the Yoc de Ramirez FOIA Request in violation of the FOIA.

84.    Plaintiff AOL has constructively exhausted its administrative remedies because ICE has failed to make a determination in response to the Yoc de Ramirez FOIA Request within the time period required by law.  Given this fact, Plaintiff AOL seeks immediate judicial review.

     **2.**    **The ICE Meta-FOIA Request submitted by Plaintiff AOL.**

85.    On March 11, 2021, Plaintiff AOL sent ICE a FOIA request regarding various prior FOIA requests (the "ICE Meta-FOIA Request").  *See* **Exhibit F**.

86.     The ICE Meta-FOIA Request requested all records created in response to various FOIA requests designated by ICE-assigned the following tracking numbers:

    a.     2021-ICFO-24148;

    b.     2021-ICFO-24506;

    c.     2021-ICFO-24149;

    d.     2021-ICFO-24150; and

    e.     2021-ICFO-32190.

87.     As stated within the ICE Meta-FOIA Request, "[a]n adequate search will include tasking ICE's FOIA office with retrieving all tasking and correspondence with custodians of records, any communications between ICE-FOIA and any other FOIA office, and any other agency records, whether database, email, or paper files, created as a result of receiving the FOIA requests listed below." *Id.*

88.     On March 11, 2021, ICE acknowledged receipt of the ICE Meta-FOIA Request and assigned it tracking number 2021-ICFO-32419.

89.     On March 22, 2021, ICE sent correspondence to Plaintiff AOL that it had invoked a ten (10) day extension, as allowed by Title 5 U.S.C. § 552(a)(6)(B), to respond to the ICE Meta-FOIA Request.

90.     On April 23, 2021, May 24, 2021, June 23, 2021, July 23, 2021, August 23, 2021, September 22, 2021, and October 22, 2021, Plaintiff AOL, via the MuckRock platform, sent correspondence to ICE inquiring as to when a response to the ICE Meta-FOIA Request would be received.  To date, Plaintiff AOL has not received any substantive response from ICE to any of these communications.

91.     As of the date of this amended filing – ***414 days after submission of the initial request*** – Plaintiff AOL has not received any substantive response from ICE to the ICE Meta-FOIA Request, nor has ICE otherwise produced records responsive to the ICE Meta-FOIA Request in violation of the FOIA.

18

92.    Plaintiff AOL has constructively exhausted its administrative remedies because ICE has failed to make a determination in response to the ICE Meta-FOIA Request within the time period required by law.  Given this fact, Plaintiff AOL seeks immediate judicial review.

### 3.    The CRCL Report FOIA Request submitted by Plaintiff AOL.

93.    On December 16, 2021, Plaintiff AOL sent Defendant DHS CRCL a FOIA request for records regarding various ICE Detention Centers (the "CRCL Report FOIA Request").  *See* **Exhibit G**.

94.    Specifically, the request sought:

a.    The November 17, 2017 report sent by CRCL to ICE regarding Winn Correctional Center;

b.    The August 10, 2021 CRCL memorandum regarding Winn Correctional Center;

c.    Any reports or recommendations concerning complaints assigned numbers 000945-21-ICE, 21-05-ICE-0248, and 000382-21;

d.    Any other recommendations or reports regarding any ICE detention facilities within the New Orleans ICE Field Office of Responsibility (Adams County Detention Center, Allen Parish Public Safety Complex, Etowah County Detention Center, Jackson Parish Correctional Center, LaSalle ICE Processing Center, Pine Prairie ICE Processing Center, Richwood Correctional Center, River Correctional Center, South Louisiana ICE Processing Center, Winn Correctional Center) dated or sent from January 1, 2017 until the time this search is conducted;

e.    All communications sent by or received from CRCL concerning or in connection to any of the above complaints and investigations;

f.    All records collected for or used in any of the above complaints and investigations.

95.    On February 7, 2022, DHS CRCL responded to the CRCL Report FOIA Request and identified both materials that would be released in response to this FOIA request and records and information that would be withheld pursuant to certain FOIA exemptions.

96.    Further, in its February 7, 2022 letter, DHS CRCL identified that there were 259 pages of records responsive to the CRCL Report FOIA Request that originated with ICE and

thus this FOIA request would be referred to ICE for processing and direct response as to those 259 pages.  *See* **Exhibit H**.

97.     On February 15, 2022, ICE acknowledged receipt of the CRCL Report FOIA Request received on February 4, 2022, and assigned it tracking number 2022-ICFO-07670.

98.     As of the date of this amended filing – ***62 days after referral to ICE of the CRCL Report FOIA Request*** – Plaintiff AOL has not received any substantive response to the CRCL Report FOIA Request from ICE, nor has ICE otherwise produced records responsive to the CRCL Report FOIA Request in violation of the FOIA.

99.     Plaintiff AOL has constructively exhausted its administrative remedies because ICE has failed to make a determination in response to the CRCL Report FOIA Request within the time period required by law.  Given this fact, Plaintiff AOL seeks immediate judicial review.

**G.     DEFENDANTS' UNLAWFUL FAILURE TO ACKNOWLEDGE OR RESPOND TO PLAINTIFF MIRAN'S FOIA REQUESTS**

100.     On June 19, 2018, Plaintiff Miran, through counsel, submitted the same FOIA request to ICE, DHS CRCL, DHS OIG, BOP, and USCIS seeking all agency records relating to "Gourgen Mirimanian, a citizen and national of Armenia, A 070 963 630, DOB 3/16/1964" (the "Gourgen FOIA Request").  *See* **Exhibit I**.

**1.     DHS CRCL's Failure To Acknowledge Or Respond To The Gourgen FOIA Request.**

101.     As of the date of this amended filing – ***nearly 4 years after submission of the initial request*** – Plaintiff Miran has not received any acknowledgement from DHS CRCL of the Gourgen FOIA Request, or any tracking number or substantive response, nor has DHS CRCL otherwise produced records responsive to the Gourgen FOIA Request in violation of the FOIA.

102.     Plaintiff Miran has constructively exhausted his administrative remedies because DHS CRCL has failed to make a determination in response to the Gourgen FOIA Request within the time period required by law.  Given this fact, Plaintiff Miran seeks immediate judicial review.

**2.     ICE's Failure To Sufficiently Respond To The Gourgen FOIA Request.**

103.     On June 25, 2018, ICE acknowledge the Gourgen FOIA Request and assigned it tracking number 2018-ICFO-45391.

104.    On July 6, 2018, ICE issued its final response to the Gourgen FOIA Request, which consisted of just two pages of records.

105.    Only July 14, 2018, Plaintiff Miran, through counsel, timely appealed ICE's final response.  The basis of the appeal was that ICE's two-page response evidenced a demonstrably inadequate search and production, and contained legally insufficient justifications for the withholdings applied.

106.    ICE's Government Information Law Division acknowledged receipt of Plaintiff Miran's appeal and assigned the appeal tracking number 2018-ICAP-00390.

107.    On August 22, 2018, ICE sustained the bulk of Plaintiff Miran's appeal and remanded to the ICE FOIA Office to task and conduct further searches.

108.    On May 6, 2019, ICE responded to the agency's remand, indicating that the agency was applying a blanket withholding of all records allegedly pursuant to FOIA Exemption 7A based on an allegedly open investigation into Gourgen's death. *See* **Exhibit J**.

109.    The agency's May 6, 2019, response to Plaintiff Miran states, "Please be advised that once all pending matters are resolved and FOIA Exemption 7(A) is no longer applicable, there may be other exemptions which could protect certain information from disclosure, such as FOIA Exemptions 6, 7(C), 7(D), 7(E), and/or 7(F)." *Id.*

110.    ICE's May 6 communication does not purport to be a final decision on the remanded request, and it did not inform Plaintiff Miran of his right to appeal the blanket Exemption 7A withholdings.

111.    Consequently, Plaintiff Miran has constructively exhausted his administrative remedies.

112.    Records obtained through separate FOIA requests indicate that ICE had no open investigation into Gourgen's death at the time ICE sent its May 6, 2019, response.  Specifically, the Mortality Review IHSC conducted for Gourgen's death indicates the review was complete and transmitted to agency stakeholders on December 18, 2018.  *See* **Exhibit K**, at pg. 73.

113.    The Healthcare and Security Compliance Analysis ICE commissioned to investigate Gourgen's death bears a date of June 24, 2018.  *Id.* at p. 1.

114.     In response to a separate FOIA request submitted by counsel for Plaintiff Miran for a list of open, in-custody death investigations as of May 8, 2019 (two days *after* ICE categorically withhold all records from Gourgen's family based on a blanket Exemption 7A assertion), ICE provided a record of four open investigations during that period.  None of them is Gourgen's. *See* Response to 2019-ICAP-00532, **Exhibit L**.

115.     Plaintiff Miran has received no additional records responsive to this request since ICE's blanket assertion of Exemption 7A on May 6, 2019.

116.     However, on September 8, 2020, 16 months after applying the blanket assertion of the 7A exemption based on the allegedly open death investigation, ICE released to Plaintiff Miran agency records that were referred to it by USCIS in the course of its response to Plaintiff's June 2018 FOIA request.  *See* **Exhibit M**.

117.     Those records, designated under tracking number 2020-ICFO-82621, contain only the ICE Office of Principal Legal Advisor's portion of Gourgen's Alien File.  They contain no detention or medical records pertaining to Gourgen, and contain no records regarding ICE's death investigation. *See id.*

118.     On information and belief, ICE falsified the information in the May 6, 2019, FOIA communication by stating an open investigation into Gourgen's death existed when it did not.

119.     The purpose of this falsification was to prevent Gourgen's family, including Plaintiff Miran, from gaining timely access to the evidence they would need to expose, in real-time, the danger that ICE's detention operations pose to people with chronic health conditions.

120.     As of the date of this amended filing – ***nearly 4 years after submission of the initial request*** – Plaintiff Miran has not received any substantive response from ICE, and ICE has not otherwise produced records responsive to the Gourgen FOIA Request.

121.     Plaintiff Miran has constructively exhausted his administrative remedies because ICE has failed to make a determination in response to the Gourgen FOIA Request within the time period required by law.  Given this fact, Plaintiff Miran seeks immediate judicial review.

**CLAIMS FOR RELIEF**

**COUNT I: VIOLATION OF 5 U.S.C. § 552(a)(4)(B)**
**Unlawful Withholding Of Agency Records By ICE**
**All Plaintiffs Against ICE**

122.     Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

123.     ICE is a component of a U.S. government agency subject to the FOIA and must therefore make reasonable efforts to search for and release requested records and otherwise lawfully support and provide the basis for any withholdings made pursuant to the exemptions provided by the FOIA.

124.     Plaintiff Tammy has a legal right under the FOIA to the timely search and release of responsive, non-exempt agency records responsive to the Owen FOIA Request.

125.     Plaintiff AOL has a legal right under the FOIA to the timely search and release of responsive, non-exempt agency records responsive to the Yoc de Ramirez FOIA Request, the ICE Meta-FOIA Request, and the CRCL Report FOIA Request.

126.      Plaintiff Miran has a legal right under the FOIA to the timely search and release of responsive, non-exempt agency records responsive to the Gourgen FOIA Request (collectively, and with the Owen FOIA Request, Yoc de Ramirez FOIA Request, the ICE Meta FOIA Request, and the CRCL Report FOIA Request, the "ICE FOIA Requests").

127.     No legal basis exists for ICE's failure to adequately and timely search for and release agency records responsive to the ICE FOIA Requests in compliance with the FOIA's time limits.

128.     ICE's failure to make reasonable and timely efforts to search for and release agency records responsive to the ICE FOIA Requests constitutes an unlawful withholding under the Act that this Court can and should remedy through declaration and injunction.

129.     ICE's failure to initiate an adequate search and substantively respond to the ICE FOIA Requests within the timeframe allowed by law violates the FOIA.

130.     Because ICE has failed to comply with the Act's time limits, Plaintiffs have constructively exhausted their administrative remedies.

131.     Plaintiffs are therefore entitled to injunctive and declaratory relief requiring ICE to promptly make reasonable efforts to search for and produce records responsive to each and all of the ICE FOIA Requests.

**COUNT II: VIOLATION OF 5 U.S.C. § 552(a)(4)(B)**
**Failure To Assign The Required Individualized Tracking Number By ICE**
**Plaintiffs Tammy Owen and AOL Against ICE**

132.     Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

133.     ICE is under a legal duty to "provide each person making a request the tracking number assigned to the request."  5 U.S.C. § 552(a)(7)(A).

134.     ICE violated this legal duty by failing to acknowledge and assign the Owen FOIA Request an individualized tracking number.

135.     ICE violated this legal duty by failing to acknowledge and assign the Yoc de Ramirez FOIA Request an individualized tracking number.

136.     No legal basis exists for failing to assign the Owen FOIA Request or the Yoc de Ramirez FOIA Request tracking numbers and to timely process these requests.

137.     ICE's failure to make reasonable and timely efforts to search for and release agency records responsive to the Owen FOIA Request and the Yoc de Ramirez FOIA Request constitute an unlawful withholding under the Act that this Court can and should remedy through injunction.

138.     Because ICE has failed to comply with the Act's time limits, Plaintiffs Tammy Owen and AOL have constructively exhausted their administrative remedies.

139.     Plaintiffs Tammy Owen and AOL are therefore entitled to injunctive and declaratory relief requiring ICE to promptly make reasonable efforts to search for and produce records responsive to the Owen FOIA Request and the Yoc de Ramirez FOIA Request.

**COUNT III: VIOLATION OF 5 U.S.C. § 552(a)(4)(B)**
**Unlawful Withholding Of Agency Records By DHS CRCL**
**Plaintiffs AOL and Miran Against DHS CRCL**

140.     Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

141.    Plaintiff AOL has a legal right under the FOIA to the timely search and release of responsive, non-exempt agency records responsive to the CRCL Report FOIA Request.

142.    Plaintiff Miran has a legal right under the FOIA to the timely search and release of responsive, non-exempt agency records responsive to the Gourgen FOIA Request.

143.    No legal basis exists for DHS CRCL's failure to adequately and timely search for and release agency records responsive to the CRCL Report FOIA Request or the Gourgen FOIA Request in compliance with the FOIA's time limits.

144.    DHS CRCL's failure to make reasonable and timely efforts to search for and release agency records responsive to the CRCL Report FOIA Request and the Gourgen FOIA Request constitutes an unlawful withholding under the Act that this Court can and should remedy through declaration and injunction.

145.    DHS CRCL's failure to initiate an adequate search and substantively respond to the CRCL Report FOIA Request and the Gourgen FOIA Request within the timeframe allowed by law violates the FOIA.

146.    Because DHS CRCL has failed to comply with the Act's time limits, Plaintiff AOL has constructively exhausted its administrative remedies.

147.    Plaintiffs AOL and Miran  are therefore entitled to injunctive and declaratory relief requiring DHS CRCL to promptly make reasonable efforts to search for and produce records responsive to the CRCL Report FOIA Request and the Gourgen FOIA Request.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Enter judgment on all counts in favor of Plaintiffs and against Defendants.

2.    Order Defendants to conduct a prompt and adequate search for all records responsive to the FOIA Requests, determine which, if any, portions of such are records are exempt, and require Defendants to release the remaining portions of these agency records.

3.    Order Defendants to produce, within twenty (20) days of the Court's order, or by such other date as the Court deems appropriate, all non-exempt records responsive to the

FOIA Requests, all segregable records responsive to the FOIA Requests, and indices justifying the withholding of any responsive records withheld under any claim of exemption.

4. Declare Defendants' withholdings under the FOIA unlawful and enjoin Defendants from continuing to withhold all non-exempt records responsive to the FOIA Requests.

5. Declare that Defendants have violated the promptly available provision of the FOIA and enter Judgment in Plaintiffs' favor on that count.

6. Declare Defendants' documented violations of their own standards, combined with their violations of the FOIA as described above, render the presumptions of good-faith and reliability inapplicable to statements by the agency in this case.

7. Issue written findings that Defendants' withholding of records in this case was arbitrary and capricious, and issue a referral to the Special Counsel as described in the FOIA to initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

8. Award Plaintiffs reasonable costs and attorneys' fees pursuant to 5 U.S.C. § 552(a)(4)(E) and/or 28 U.S.C. § 2412(d)(1)(A).

9. Award Plaintiffs such further relief as the Court deems just, equitable, and appropriate.

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1    Dated:  April 29, 2022

2                                                    Respectfully submitted,

3                                                    **GRANT & EISENHOFER P.A.**

4                                                    By: */s/ Kimberly A. Evans*
                                                     Kimberly A. Evans *(pro hac vice)*
5                                                    Samuel Mukiibi (*pro hac vice*)
                                                     Carla Agbiro (*pro hac vice*)
6                                                    Grant & Eisenhofer P.A.
                                                     123 Justison Street, 7th Floor
7                                                    Wilmington, DE 19801
                                                     Tel: (302) 622-7086
8                                                    kevans@gelaw.com

9                                                    **GRANT & EISENHOFER P.A.**
                                                     M. Elizabeth Graham (Cal. Bar No. 143085)
10                                                   201 Mission Street, Suite 1200
                                                     San Francisco, California 94105
11                                                   Tel: 415-293-8210
                                                     Fax: 415-789-4367
12                                                   egraham@gelaw.com

13                                                   **GRANT & EISENHOFER P.A.**
                                                     Irene R. Lax *(pro hac vice)*
14                                                   Grant & Eisenhofer P.A.
                                                     485 Lexington Ave, 29th Floor
15                                                   New York, NY 10017
                                                     Tel: (646) 722-8512
16                                                   ilax@gelaw.com

17                                                   **AL OTRO LADO, INC.**
                                                     Karlyn Kurichety (Cal Bar No. 313265)
18                                                   634 S Spring St, Suite 908
                                                     Los Angeles, CA 90014
19                                                   Tel: (253) 882-8071
                                                     karlyn@alotrolado.org
20

21                                                   *Attorneys for Plaintiffs*

22

23

24

25

26

27

28

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing, **FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**, was filed and served electronically through the Court's CM/ECF system on the following counsel of record:

M. Andrew Zee
U.S. DEPARTMENT OF JUSTICE
Civil Division - Federal Programs Branch
450 Golden Gate Avenue Room 7-5395
San Francisco, CA 94102
Tel: 415-436-6646
Fax: 415-436-6632
m.andrew.zee@usdoj.gov
*Counsel for Defendants, U.S. Immigration and Customs Enforcement and*
*U.S. Department of Homeland Security – Office for Civil Rights and Civil Liberties*

Respectfully submitted,

*/s/ Kimberly A. Evans*
Kimberly A. Evans

Date:   April 29, 2022

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**